# Exhibit E

FILED
LOS ANGELES SUPERIOR COURT
JAN 1 5 2002
JOHN A. CLARKE, CLERK
BY S. J. WHITLOW, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES**

JOHN DELANEY, on behalf of himself individually, and of all others similarly situated, and on behalf of the general public; and MICHAEL E. O'KEEFE, on behalf of the general public,

Plaintiffs,

v.

WARNER-LAMBERT COMPANY, a Delaware corporation; PARKE-DAVIS & COMPANY, a Michigan corporation; and Does 1 through 100, inclusive,

Defendants.

Case No: BC227414

JUDICIAL COUNCIL COORDINATION PROCEEDING NO.: 4122

STATEMENT OF DECISION RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## I.

## BACKGROUND

Beginning in 1997, defendants manufactured and marketed the drug Rezulin for treatment of Type II, or adult-onset, diabetes. The drug was ultimately taken off the market on March 20, 2000.

According to plaintiffs, defendant Warner-Lambert's advertising and marketing campaign

"uniformly concealed material and critical information" about Rezulin's risks and potential side effects. Plaintiffs claim that defendant "knew" that Rezulin would kill a certain percentage of people who took it, yet promoted the drug as "safe" and comparable to a "placebo." Plaintiffs claim that Rezulin was in fact highly toxic to 1 and 20 users, causing liver damage which, if unchecked, would leave to jaundice, liver failure, and/or death.

Plaintiffs assert that Warner-Lambert commenced its ad campaign for Rezulin at least six months before FDA approval. Warner-Lambert's CEO, Melvin Goode, allegedly predicted that Rezulin would be a "breakthrough" and "blockbuster" drug. Rezulin exceeded sales projections within the first few months of its release, and garnered a significant portion of the diabetic drug market. Plaintiffs claim that the primary reason for the success of the drug can be attributed to defendant's direct-to-consumer ad campaigns.

According to plaintiffs, the ad campaigns included "three basic deceptive themes: (1) effectiveness, (2) safety, and (3) credibility and trust."[1] Plaintiffs also claim that Warner Lambert created confidence among physicians by paying specialists to endorse the drug, and funding and sponsoring organizations of specialists which recommended the drug's use.

In late-1997, Rezulin's European licensee, Glaxo-Welcome, withdrew the drug from the market after reports of adverse side effects including fatalities. Plaintiffs assert that defendant's public relations and marketing executives adopted a four-prong defensive strategy in anticipation of the upcoming problems: 1) "falsely denying" there was anything in AE reports which was inconsistent with the "excellent safety profile" for Rezulin supposedly observed during pre-marketing clinical trials; 2) recommending to physicians that they monitor their patients using

[1] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 7.

Rezulin with blood tests for elevated ALT liver enzyme levels on a monthly basis; 3) instructing salesmen to stress the danger of *diabetes*, and to e-emphasize the adverse side effects of Rezulin through the so-called "Detail Sheets"; and 4) attacking the victim and not the drug.

However, plaintiffs claim that defendant "was unable to suppress the deadly truth about Rezulin indefinitely."[2] The FDA opened hearings on Rezulin which lasted for months and ultimately resulted in defendant pulling Rezulin from the market. Plaintiffs also claim that an August 3, 1998 Warner-Lambert email revealed 26 reported fatalities and 320 cases of serious liver toxicity due to Rezulin.

Plaintiffs claim that during the time Rezulin was on the market, 1.23 million people used the drug, with more than 200,000 users in California. Defendant reportedly made $2 billion in sales, and spent over $425 million in ads and promotions.

Plaintiffs John Delaney and Elliott Rosman seek certification of the class in BC227414. The proposed class is defined as "all persons or entities who purchased Rezulin in the State of California up to and including the date of this complaint."[3] Plaintiffs define the class period as between March 1, 1997 and March 20, 2000.[4]

## II.

## DISCUSSION

**Standards on Class Certification**

---

[2] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 10.

[3] Complaint, ¶13.

[4] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 1.

CCP § 382 allows the Court to certify a class action "when the question is one of a common interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court..." Additionally, "[t]here must be questions of law or fact common to the class that are substantially similar and predominate over the questions affecting the individual members; the claims of the representatives must be typical of the claims or defenses of the class; and the class representatives must be able to fairly and adequately protect the interests of the class." *Apple Computer, Inc., supra*, 91 Cal.App. 4th at 237-238.

Stated differently, there are two requirements for a class action: 1) an ascertainable class; and 2) a well-defined community of interest. *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal. App. 4th 980, 913 (2001).

In determining whether the class is ascertainable, courts consider the size of the class, the class definition, and the means to identify class members. *Reyes v. San Diego County Board of Supervisors*, 89 Cal. App. 3d 1263, 1274 (1987). The community of interest factor is established by showing: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. *Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429, 435 (2000).

Moreover, California follows the procedures set forth under Federal Rules of Civil Procedure 23 for class actions, whenever California authority is lacking. *City of San Jose v. Superior Court (Lands Unlimited)*, 12 Cal. 3d 447, 453 (1974).

The burden of proof on a motion for class certification is on the party seeking certification. *Washington Mutual Bank, N.A. v. Superior Court*, 24 Cal. 4th 906, 922. In this case, that burden falls on plaintiffs John Delaney and Elliot Rosman.

**1. Ascertainability/Numerosity**

"Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata." *Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 914. "If the existence of an ascertainable class has been shown, there is no need to identify its individual members in order to bind all members by the judgment." *Daar v. & Yellow Cab Company* (1967) 67 Cal.2d 695, 706.

In order to satisfy the numerosity requirement, the class must be so numerous that joinder is impractical. FRCivPro 23(a). Case law indicates that 30-40 plaintiffs satisfies the numerosity requirement, because at that point, individual joinder is impractical. *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934.

Defendants do not address the ascertainability/numerosity requirement in their opposition to plaintiffs' class certification motion. In any case, the Court finds that the ascertainability and numerosity factors are satisfied. The class is defined as "all persons or entities who purchased Rezulin in the State of California up to and including the date of this complaint."[5] At the class certification hearing, plaintiffs proposed revising this class definition to exclude those individuals who suffered personal injury as a result of taking Rezulin. Under either definition, the proposed class is ascertainable. Moreover, according to plaintiffs, the class consists of approximately 200,000 members. Joinder of these 200,000 class members would be impractical.

For these reasons, the Court finds that plaintiffs have met their burden under *Washington Mutual Bank, supra*, of showing the class is ascertainable and numerous.

---

[5] Complaint, ¶13.

**2. Community of Interest**

The Court finds that plaintiffs have not shown under California law that there is an adequate "community of interest" for class certification. The Court takes each of the CCP § 382 factors in turn.

**a. Common Questions of Law and Fact Do Not Predominate**

In deciding whether the common question "predominates," and whether a class action would be "superior" to individual lawsuits, courts usually consider:

> 1) The interest of each member in controlling his or her own case personally;
>
> 2) The difficulties, if any, that are likely to be encountered in managing a class action;
>
> 3) The nature and extent of any litigation by individual class members already in progress involving the same controversy; and
>
> 4) The desirability of consolidating all claims in a single action before a single court. Weil & Brown, *Civil Procedure Before Trial*, § 14:16 (citing FRCivPro 23(b)(3)).

Additionally, a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages. *Vasquez v. Superior Court*, 4 Cal.3d 800, 815-816 (1971). However, a class action "will not be permitted...where there are diverse factual issues to be resolved, even though there may be many common questions of law." *Brown v. Regents of Univ. of Calif.*, 151 Cal. App. 3d 982, 988-89 (1984).

Even though damages between class members may differ under this element, the Court finds that plaintiffs have not met their burden under *Washington Mutual* of showing that common questions of law and fact predominate. In paragraph 15 of the complaint, plaintiffs set forth the

following questions of law or fact which they claim predominate over any questions which may affect only individual members of the class:

a) whether Defendants engaged in unlawful business practices in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

b) whether Defendants engaged in unfair business practices in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

c) whether Defendants engaged in fraudulent business practices in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

d) whether Defendants engaged in unfair, deceptive, untrue or misleading advertisements in violation of provisions of California Business and Professions Code, Section 17200 *et seq.;*

e) whether Defendants violated provisions of California Business and Professions Code, Section 17500 *et seq.*;

f) whether Defendants made false and misleading claims in advertising to consumers, including but not limited to claims that (1) purport to be based on factual, objective, or clinical evidence, and/or that (2) compare Rezulin's effectiveness and/or safety to that of other brands of drugs used in the treatment of diabetes; and/or (3) purport to be based on fact that Rezulin is a safe and effective treatment of type 2 diabetes in violation of California Business and Professions Code, Section 17500 *et seq.;*

g) whether Defendants violated California Civil Code, Section 1770(a)(5) [CLRA] by misrepresenting the characteristics, benefits, or qualities of Rezulin;

h) whether Defendants violated California Civil Code, Section 1770(a)(7) by misrepresenting the quality of the goods provided by Defendants;

i) the effect of Defendants' conduct upon Plaintiff John Delaney, and the members of the Class; and

j) the appropriate measure of restitution of all ill gotten gains.

At first impression, the allegations in ¶15 would seem to indicate predominate questions of law and fact exist with regard to defendants' alleged violations of the UCL and the CLRA. However, the

analysis of the "predominate common question" element does not end with a cursory "glancing over" these allegations. If the proposed class was certified, the subsequent trial of the CLRA claim would necessarily require the Court to make a case-by-case inquiry on whether each putative class member sustained any damage as a result of the allegedly false advertising (i.e., the Court would be required to make a determination as to reliance and damage thereby as to each putative class member). In other words, while some class members and physicians may have been misled in violation of the CLRA, others may not have been. The *extent* to which individual plaintiffs were misled by the advertisements (and corresponding impact of those advertisements) necessitates a further individual case inquiry. The Court would also have to conduct an individualized analysis on the reliance of putative class members (and their physicians) on defendants' advertisements promoting Rezulin. The Court finds that such inquiries are inappropriate for a class action. Aside from paragraph 15's allegations, there is no evidence indicating that common questions of fact and law *predominate*.

As to the 17200 claim, reliance is not a factor (the issue being whether the advertisements were likely to deceive rather than if they actually deceived any consumer). However, this cause of action raises another problem requiring individualized analysis. In the complaint, plaintiffs allege two basic deceptive statements: that Rezulin was effective and that Rezulin was safe. While the "safety" issue can be addressed on a classwide basis, the "effectiveness" issue cannot. The evidence is that Rezulin was effective in controlling some patients' blood sugar and ineffective as to other patients. In order to determine this "effectiveness" issue, the trier of fact would be required to hold individual mini-trials. Was Rezulin effective for this particular class member? To what extent? Of the $5.00 per pill cost, was the drug worth $1.00 to this class member because of its effectiveness or $3.50? The variations are endless and extremely individualized. To deal with this problem,

plaintiffs at the class certification hearing indicated that they would waive the "effectiveness" argument, assume for purposes of this litigation that Rezulin was effective, and simply proceed on the "safety" argument. Such a waiver, however, would violate the class representatives' fiduciary duties to the class. For those class members for whom Rezulin was not effective, their damages could potentially include the cost of the drug for the entire time they took it (an amount that could be in excess of $5,000 per class member). Class plaintiffs may only recover once for the purchase of the drug; by seeking damages only on the "safety" theory, plaintiffs would effectively waive, on behalf of thousands of class members, any possible recovery of potential damages on the "effectiveness" theory. This plaintiffs may not do. *City of San Jose, supra at 464.* Again, common questions do not predominate.

The facts of the instant case are analogous to those in *City of San Jose*. Plaintiffs in *City of San Jose* sought recovery for diminution in the market value of their property allegedly caused by aircraft noise, vapor, dust, and vibration as a result of airplanes flying to and from the San Jose Municipal Airport. The trial court certified the class. The California Supreme Court reversed, and determined that the trial court abused its discretion in certifying the class. The Court concluded that the action for nuisance and inverse condemnation was "predicated on facts peculiar to each prospective plaintiff." *City of San Jose* at 461. The Court reasoned:

> An approaching or departing aircraft may or may not give rise to actionable nuisance or inverse condemnation depending on a myriad of individualized evidentiary factors. While landing or departure may be a fact common to all, liability can be established only after extensive examination of the circumstances surrounding each party. Development, use, topography, zoning, physical condition, and relative location are among the many important criteria to be considered. No one factor, not even noise level, will be determinative as to all parcels. *City of San Jose* at 461.

Like *City of San Jose*, the Court would only be able to determine liability in *Delaney* based "on a

myriad of individualized evidentiary factors." The allegedly false/misleading advertising in violation of the UCL and CLRA are facts common to all, but as discussed *supra*, the Court would have to examine the individual circumstances surrounding each purported violation.

In short, there *are* common legal and factual questions in this case. However, the key to the common legal/factual issues factor is whether those issues *predominate*. For these reasons, the legal and factual questions do not predominate. The Court finds the "commonality" factor is not satisfied.

**b. Typicality**

In order to satisfy the typicality requirement, "[class] representatives must have the same interests and have suffered the same injuries as members of the proposed class." *Zachary v. Texaco Exploration & Production, Inc.*, 185 F.R.D. 230, 240 (W.D. Tex. 1999). "The purported representative's claim must be 'typical,' but not necessarily identical to the claims of other members." Weil & Brown, *Civil Procedure Before Trial*, § 14:43. It is sufficient that the representative is *similarly situated*, so that he or she will have the *motive to litigate* on behalf of all class members. *Classen v. Weller*, 145 Cal. App. 3d 27, 45.

In analyzing the "typicality" requirement, *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644 is also instructive. In *Caro*, a consumer filed a class action complaint against defendants for, *inter alia*, fraud and deceit, negligent misrepresentation, unlawful, unfair, or fraudulent business practices, violation of the Consumer Legal Remedies Act, unjust enrichment, and falsely advertising food. The plaintiff's complaint alleged that the defendants falsely represented its Citrus Hill products "to be fresh orange juice, made from the heart of the orange, 100% pure orange juice, additive free, and from oranges picked and squeezed on the same day." *Caro* at 652. The plaintiff sought to certify a class composed of "'all' the 'millions of persons' in the United

States who bought Citrus Hill products." *Caro* at 652.

The trial court denied the plaintiff's motion for class certification. The Court of Appeal affirmed, finding that plaintiff failed to establish that his claims were typical of the class, that there would be no substantial benefit to the litigants or the court if the class was certified, that individual issues predominated, and that plaintiff was an inadequate class representative. In affirming the trial court's order, the Court of Appeal noted that the plaintiff testified in his deposition that he did not believe the juice was "fresh" - instead, "the evidence indicated he himself believed the juice was simply 'premium.'" *Caro* at 664.

With that backdrop, the Court finds plaintiffs Delaney and Rosman have not met their burden of showing their claims are typical of those in the proposed classes. They conclude the typicality factor is satisfied "because all members of the class are uniformly and without exception, seeking the same remedy, which is to have Warner-Lambert disgorge its ill gotten gains that *may* have been acquired as a result of Warner-Lambert's unlawful, deceptive and unfair conduct under B&P § 17203."[6] The evidence, however, indicates the plaintiffs' individual claims are *not* typical of the putative class claims. Plaintiffs Delaney and Rosman testified in deposition that they did not see any ads that mentioned Rezulin by name. Delaney Dep. 10:4-14:15; Rosman Dep. 9:17-10:10; 43:10-11. As in *Caro*, the evidence here shows that plaintiffs were not "misled in the manner the class was allegedly deceived." *Caro*, 18 Cal.App.4th at 664. Moreover, there is no evidence that plaintiffs Delaney and Rosman sustained *any* damage as a result of the defendants' alleged UCL and CLRA violations.

For these reasons, the Court finds that plaintiffs have not satisfied the typicality requirement.

[6] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 17.

**c. Adequacy of Representation**

"The primary criterion in determining adequacy of representation is whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class." *Simons v. Horowitz*, 151 Cal. App. 3d 834, 846 (1984). Additionally, the class representative must "raise claims reasonably expected to be raised by the members of the class." *City of San Jose, supra,* 12 Cal. 3d at 464). The fiduciary duty must be undertaken free of demonstrable conflicts of interest with other class members. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). The "adequacy of representation" requirement has not been precisely differentiated from the typicality requirement. *Caro v. Procter & Gamble, supra,* 18 Cal. App. 4th at 670. Other cases have stated that "adequacy of representation" depends on whether plaintiff's attorney is qualified to conduct the proposed litigation and plaintiff's interests are not antagonistic to the interests of the class. *McGhee v. Bank of America*, 60 Cal. App. 3d 442, 450 (1976).

The Court finds the *McGhee* standard is generally appropriate in determining whether the adequacy of representation requirement is met. Under *McGhee*, the Court finds that counsel is qualified to conduct the proposed litigation, and that plaintiff's interests are not antagonistic to the interests of the class. The Declarations of David R. Markham, Barry A. Fisher, and Kevin M. Prongay all indicate that counsel is experienced in handling similar consumer class action cases. However, as previously discussed, by proceeding only on the "safety" theory of liability, while conceding the "effectiveness" theory, plaintiffs would not be raising all claims "reasonably expected to be raised by the class," and, therefore, plaintiffs' representation would be inadequate. *City of San Jose at 464.* The Court finds that plaintiffs have not satisfied the "adequacy of representation" requirement.

**d. Superiority Not Present**

In deciding whether a class action would be "superior" to individual lawsuits, courts usually consider:

1) The interest of each member in controlling his or her own case personally;

2) The difficulties, if any, that are likely to be encountered in managing a class action;

3) The nature and extent of any litigation by individual class members already in progress involving the same controversy; and

4) The desirability of consolidating all claims in a single action before a single court. Weil & Brown, *Civil Procedure Before Trial*, § 14:16 (citing FRCivPro 23(b)(3)).

The first factor weighs in favor of a finding of superiority. Given the relatively small amount of recovery each class member would seek (plaintiffs estimate this would be approximately $2,000 each),[7] each class member would not, comparatively speaking, have a great interest in controlling his or her own case personally.

The second and fourth factors are inter-related. As noted *supra*, the fact that common questions of fact and law do not predominate would make a class action of the sort proposed by plaintiffs more difficult to manage. It would not be desirable to consolidate all of claims in a single action, because this would add to problems in managing the case (i.e., individual trials would be necessary to resolve the reliance and damage issues at the heart of the proposed class actions). To this end, the *Caro* court noted as follows:

> In a suit arising under Business and Professions Code section 17200 et seq., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action. [Citations.] [¶] In contrast to the streamlined procedure expressly provided by the Legislature, the management of a

---

[7] Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification at 3.

> class action is 'a difficult legal and administrative task.' [Citation.]" *Caro, supra*, 18 Cal.App.4th at 644 (citing *Dean Witter Reynolds v. Superior Court*, 211 Cal.App.3d 758, 773 (1989)).

The second and fourth factors weigh against a finding of superiority.

The third factor weighs in favor of a finding of superiority. Defendants essentially concede that "numerous lawsuits of this type have not been filed."[8] While there are approximately 100 cases seeking personal injury damages as part of this coordinated proceeding, those cases do not involve the same controversy as the instant case.

On balance, class certification would not be a superior means to resolve the instant case. The Court finds that plaintiffs have not established the superiority factor.

## III.

## CONCLUSION AND ORDER

The Court finds that plaintiffs have not met their burden of showing that class certification is appropriate in this case. The motion for class certification is denied.

Dated: January 15, 2002

ANN KOUGH
Judge of the Superior Court

---

[8] Defendants' Opposition to Plaintiffs' Motion for Class Certification at 31.

# Exhibit F

# BAYCOL®

## (cerivastatin sodium tablets)

PZ500152 12/99

### DESCRIPTION

Cerivastatin sodium is sodium [S-[R*,S*-(E)]]-7-[4-(4-fluorophenyl)-5-methoxymethyl)-2,6bis(1-methylethyl)-3-pyridinyl]-3,5-dihydroxy-6-heptenoate. The empirical formula for cerivastatin sodium is $C_{26}H_{33}FNO_5Na$ and its molecular weight is 481.5. It has the following chemical structure:



Cerivastatin sodium is a white to off-white hygroscopic amorphous powder that is soluble in water, methanol, and ethanol, and very slightly soluble in acetone.

Cerivastatin sodium is an entirely synthetic, enantiomerically pure inhibitor of 3-hydroxy-3-methylglutaryl-coenzyme A (HMG-CoA) reductase. HMG-CoA reductase catalyzes the conversion of HMG-CoA to mevalonate, which is an early and rate-limiting step in the biosynthesis of cholesterol.

BAYCOL® (cerivastatin sodium tablets) is supplied as tablets containing 0.2, 0.3, or 0.4 mg of cerivastatin sodium, for oral administration. Active Ingredient: cerivastatin sodium. Inactive Ingredients: mannitol, magnesium stearate, sodium hydroxide, crospovidone, povidone, iron oxide yellow, methylhydroxypropylcellulose, polyethylene glycol, and titanium dioxide.

### CLINICAL PHARMACOLOGY

Cholesterol and triglycerides circulate as part of lipoprotein complexes throughout the bloodstream. These complexes can be separated via ultracentrifugation into high-density lipoprotein (HDL), intermediate-density lipoprotein (IDL), low-density lipoprotein (LDL) and very-low-density lipoprotein (VLDL) fractions. In the liver, cholesterol and triglycerides (TG) are synthesized, incorporated into VLDL, and released into the plasma for delivery to peripheral tissues.

A variety of clinical studies have demonstrated that elevated levels of total cholesterol (total-C), LDL-C, and apolipoprotein B (apo-B, a membrane complex for LDL-C) promote human atherosclerosis. Similarly, decreased levels of HDL-C (and its transport complex, apolipoprotein A) are associated with the development of atherosclerosis. Epidemiologic investigations have established that cardiovascular morbidity and mortality vary directly with the level of total-C and LDL-C and inversely with the level of HDL-C.

Though frequently found in association with low HDL, elevated plasma triglyceride (TG) has not been established as an independent risk factor for coronary heart disease. The independent effect of raising HDL or lowering TG on the risk of coronary and cardiovascular morbidity and mortality has not been determined.

In patients with hypercholesterolemia, BAYCOL® (cerivastatin sodium tablets) has been shown to reduce plasma total cholesterol, LDL-C, and apolipoprotein B. In addition, it also reduces VLDL-C and plasma triglycerides and increases plasma HDL-C and apolipoprotein A-1. The agent has no consistent effect on plasma Lp(a). The effect of BAYCOL® on cardiovascular morbidity and mortality has not been determined.

**Mechanism of Action:** Cerivastatin is a competitive inhibitor of HMG-CoA reductase, which is responsible for the conversion of 3-hydroxy-3-methyl-glutaryl-coenzyme A (HMG-CoA) to mevalonate, a precursor of sterols, including cholesterol. The inhibition of cholesterol biosynthesis by cerivastatin reduces the level of cholesterol in hepatic cells, which stimulates the synthesis of LDL receptors, thereby increasing the uptake of cellular LDL particles. The end result of these biochemical processes is a reduction of the plasma cholesterol concentration.

**Pharmacokinetics:**

**Absorption:** BAYCOL® (cerivastatin sodium tablets) is administered orally in the active form. The mean absolute bioavailability of cerivastatin following a 0.2-mg tablet oral dose is 60% (range 39 - 101%). In general, the coefficient of variation (based on the inter-subject variability) for both systemic exposure (area under the curve, AUC) and $C_{max}$ is in the 20% to 40% range. The bioavailability of cerivastatin sodium tablets is equivalent to that of a solution of cerivastatin sodium. No unchanged cerivastatin is excreted in feces. Cerivastatin exhibits linear kinetics over the dose range of 0.05 to 0.4 mg daily. Mean maximum concentrations ($C_{max}$) following evening cerivastatin tablet doses of 0.05, 0.1, 0.2, 0.3, and 0.4 mg are 0.6, 1.3, 2.4, 3.8, and 5.5 µg/L, respectively. AUC values are also dose–proportional over this dose range and the mean time to maximum concentration ($t_{max}$) is approximately 2.5 hours for all dose strengths. Following oral administration, the terminal elimination half-life ($t_{1/2}$) for cerivastatin is 2 to 3 hours. Steady-state plasma concentrations show no evidence of cerivastatin accumulation following administration of up to 0.4 mg daily.

Results from an overnight pharmacokinetic evaluation following single-dose administration of cerivastatin with the evening meal or 4 hours after the evening meal showed that administration of cerivastatin with the evening meal did not significantly alter either AUC or $C_{max}$ compared to dosing the drug 4 hours after the evening meal. In patients given 0.2 mg cerivastatin sodium once daily for 4 weeks, either at mealtime or at bedtime, there were no differences in the lipid-lowering effects of cerivastatin. Both regimens of 0.2 mg once daily were slightly more efficacious than 0.1 mg twice daily.

**Distribution:** The volume of distribution ($VD_{ss}$) is calculated to be 0.3 L/kg. More than 99% of the circulating drug is bound to plasma proteins (80% to albumin). Binding is reversible and independent of drug concentration up to 100 mg/L.

**Metabolism:** Biotransformation pathways for cerivastatin in humans include the following: demethylation of the pyridilic methyl ether to form M1 and hydroxylation of the methyl group in the 6'-isopropyl moiety to form M23. The combination of both reactions leads to formation of metabolite M24. The major circulating blood components are cerivastatin and the pharmacologically active M1 and M23 metabolites. The relative potencies of metabolites M1 and M23 are approximately 50% and 100% of the parent compound, respectively. Following a 0.3-mg dose of cerivastatin to 6 healthy volunteers, mean $C_{max}$ values for cerivastatin, M1, and M23 were 3.0, 0.2, and 0.5 µg/L, respectively. Therefore, the cholesterol-lowering effect is due primarily to the parent compound, cerivastatin.

**Excretion:** Cerivastatin itself is not found in either urine or feces; M1 and M23 are the major metabolites excreted by these routes. Following an oral dose of 0.4 mg $^{14}C$-cerivastatin to healthy volunteers, excretion of radioactivity is about 24% in the urine and 70% in the feces. The parent compound, cerivastatin, accounts for less than 2% of the total radioactivity excreted. The plasma clearance for cerivastatin in humans after intravenous dosing is 12 to 13 liters per hour.

*SPECIAL POPULATIONS*

Geriatric: Plasma concentrations of cerivastatin are similar in healthy elderly male subjects (>65 years) and in young males (<40 years).

Gender: Plasma concentrations of cerivastatin in females are slightly higher than in males (approximately 12% higher for $C_{max}$ and 16% higher for AUC)

Pediatric: Cerivastatin pharmacokinetics have not been studied in pediatric patients.

Race: Cerivastatin pharmacokinetics were compared across studies in Caucasian, Japanese and Black subjects. *No significant differences in AUC, $C_{max}$, $t_{max}$, and $t_{1/2}$ were found.*

Renal: Steady-state plasma concentrations of cerivastatin are similar in healthy volunteers ($Cl_{cr}$>90 mL/min/1.73m²) and in patients with mild renal impairment ($Cl_{cr}$ 61-90 mL/min/1.73m²). In patients with moderate ($Cl_{cr}$ 31-60 mL/min/1.73m²) or severe ($Cl_{cr}$ ≤ 30 mL/min/1.73m²) renal impairment, AUC is up to 60% higher, $C_{max}$ up to 23% higher, and $t_{1/2}$ up to 47% longer compared to subjects with normal renal function.

Hemodialysis: While studies have not been conducted in patients with end-stage renal disease, hemodialysis is not expected to significantly enhance clearance of cerivastatin since the drug is extensively bound to plasma proteins.

Hepatic: Cerivastatin has not been studied in patients with active liver disease (See **CONTRAINDICATIONS**). Caution should be exercised when BAYCOL® (cerivastatin sodium tablets) is administered to patients with a history of liver disease or heavy alcohol ingestion (See **WARNINGS**).

**Clinical Studies:** BAYCOL® (cerivastatin sodium tablets) has been studied in controlled trials in North America, Europe, Israel, and South Africa and has been shown to be effective in reducing plasma Total-C, LDL-C, VLDL-C, apo B, and TG and increasing HDL-C and apo A1 in patients with heterozygous familial and non-familial forms of hypercholesterolemia and in mixed dyslipidemia. Over 4,000 patients with Type IIa and IIb hypercholesterolemia were treated in trials of 4 to 104 weeks duration. The effectiveness of BAYCOL® in lowering plasma cholesterol has been shown in men and women, in patients with and without elevated triglycerides, and in the elderly. In three large, multicenter, placebo-controlled dose response studies in patients with primary hypercholesterolemia, BAYCOL® given as a single daily dose over 8 weeks, significantly reduced Total-C, LDL-C, apo B, TG, total cholesterol/HDL cholesterol (Total-C/HDL-C) ratio and LDL cholesterol/HDL cholesterol (LDL-C/HDL-C) ratio. Increases in HDL-C were also observed. Significant reductions in mean total-C and LDL-C were evident after one week, peaked at four weeks, and were maintained for the duration of the trial. (Pooled results are available in Table 1).

**Table 1**

**Response in Patients with Primary Hypercholesterolemia**
**Mean Percent Change from Baseline to Week 8**

| Dosage | n | Total-C | LDL-C | Apo-B | TG[1] | HDL-C | LDL-C/HDL-C | Total-C/HDL-C |
|---|---|---|---|---|---|---|---|---|
| Placebo | 427[2] | +1 | +1 | +2 | −1 (−66, 147) | +1 | 0 | +1 |
| BAYCOL® | | | | | | | | |
| 0.2 mg qd* | 151[3] | −18 | −25 | −19 | −16 (−58, 64) | +9 | −31 | −24 |
| 0.3 mg qd* | 497[4] | −22 | −31 | −24 | −16 (−72, 168) | +8 | −35 | −27 |
| 0.4 mg qd* | 571[5] | −24 | −34 | −26 | −16 (−61, 140) | +7 | −38 | −28 |

* qd = once daily

1 - median percent change from baseline (range).

2 - 427 patients were evaluated for all parameters except LDL-C and the ratio LDL-C/HDL-C which had 420 patients.

3 - 151 patients were evaluated for all parameters except Apo-B which had 150 patients.

4 - 497 patients were evaluated for TG and Total-C, 496 for HDL and the ratio Total-C/HDL-C, 495 for Apo-B and 494 for LDL-C and the ratio LDL-C/HDL-C.

5 - 571 patients were evaluated for all parameters except LDL-C, Apo-B and the ratio LDL-C/HDL-C which had 568, 570, and 568 patients respectively.

In a pool of seven studies in patients with hypercholesterolemia and TG levels ranging from 250 mg/dL to 500 mg/dL who were treated for at least eight weeks, the following reductions in TG were observed at Week 8 as shown in Table 2 below:

**Table 2**

**Median (min, max) Percent Change from Baseline to Week 8**
**in Patients with Baseline TG between 250-500 mg/dL**

| | Placebo | BAYCOL® 0.2 mg | BAYCOL® 0.3 mg | BAYCOL® 0.4 mg |
|---|---|---|---|---|
| N | 115 | 129 | 157 | 105 |
| Triglycerides | −3.3 (−66.1, 380.9) | −22.6 (−80.3, 182.9) | −22.4 (−79.8, 50.0) | −29.9 (−64.1, 66.0) |

In a large clinical study, the number of patients meeting their National Cholesterol Education Program-Adult Treatment Panel (NCEP-ATP) II target LDL-C levels on BAYCOL® 0.4 mg daily was assessed. The results up to 24 weeks are shown in Table 3 below:

**Table 3**

**Percent of Patients Reaching NCEP-ATP II Goal**
**Up to 24 Weeks of Treatment with BAYCOL® 0.4 mg**

| NCEP-ATP II Treatment Guidelines | | | Baseline LDL-C | | Patients Reaching Target Up to 24 Weeks |
|---|---|---|---|---|---|
| Risk Factors For CHD | Baseline LDL-C (mg/dL) | Target LDL-C (mg/dL) | Mean (mg/dL) | Patients (n) | Percent |
| < 2 risk factors | ≥ 190 | < 160 | 219 | 87 | 71% |
| ≥ 2 risk factors | ≥ 160 | < 130 | 196 | 137 | 64% |
| CHD | ≥ 130 | ≤ 100 | 176 | 69 | 29% |

### INDICATIONS AND USAGE

BAYCOL® (cerivastatin sodium tablets) is indicated as an adjunct to diet for the reduction of elevated Total-C, LDL-C, apo B, and TG levels in patients with primary hypercholesterolemia and mixed dyslipidemia (Fredrickson Types IIa and IIb) when the response to dietary restriction of saturated fat and cholesterol and other non-pharmacological measures alone has been inadequate. Therapy with lipid-altering drugs should be a component of multiple risk factor intervention in those patients at significantly high risk for atherosclerotic vascular disease due to hypercholesterolemia.

Before considering therapy with lipid-altering agents, secondary causes of hypercholesterolemia, e.g., poorly controlled diabetes mellitus, hypothyroidism, nephrotic syndrome, dysproteinemias, obstructive liver disease, other drug therapy, alcoholism, should be excluded and a lipid profile performed to measure Total-C, HDL-C, and triglycerides (TG). For patients with TG of 400 mg/dL or less, LDL-C can be estimated using the following equation:

LDL-C = [Total-C] minus [HDL-C + TG/5]

For TG levels > 400 mg/dL, this equation is less accurate and LDL-C concentrations should be directly measured by preparative ultracentrifugation. In many hypertriglyceridemic patients, LDL-C may be low or normal despite elevated Total-C. In such cases, BAYCOL® (cerivastatin sodium tablets) is not indicated.

Lipid determinations should be performed at intervals of no less than four weeks.

The National Cholesterol Education Program (NCEP) Treatment Guidelines are summarized in Table 4.

**Table 4**

**National Cholesterol Education Program (NCEP) Treatment Guidelines**
**LDL-Cholesterol mg/dL (mmol/L)**

| Definite Atherosclerotic Disease* | Two or More Other Risk Factors** | Initiation Level*** | Goal |
|---|---|---|---|
| NO | NO | ≥ 190 (≥ 4.9) | < 160 (<4.1) |
| NO | YES | ≥ 160 (≥ 4.1) | < 130 (<3.4) |
| YES | YES or NO | ≥ 130 (≥ 3.4) | ≤ 100 (≤2.6) |

* Coronary heart disease or peripheral vascular disease (including symptomatic carotid artery disease).

** Other risk factors for coronary heart disease (CHD) include the following: age (males: ≥ 45 years; females: ≥ 55 years or premature menopause without estrogen replacement therapy); family history of premature CHD; current cigarette smoking; hypertension; confirmed HDL-C < 35 mg/dL (< 0.91 mmol/L); and diabetes mellitus. Subtract one risk factor if HDL-C is ≥ 60 mg/dL (≥ 1.6 mmol/L).

*** In CHD patients with LDL-C levels 100-129 mg/dL, the physician should exercise clinical judgment in deciding whether to initiate drug treatment.

At the time of hospitalization for an acute coronary event, consideration can be given to initiating drug therapy at discharge if the LDL-C level is ≥ 130 mg/dL (NCEP-ATP II).

Since the goal of treatment is to lower LDL-C, the NCEP recommends that LDL-C levels be used to initiate and assess treatment response. Only if LDL-C levels are not available, should the Total-C be used to monitor therapy.

Although BAYCOL® may be useful to reduce elevated LDL-cholesterol levels in patients with combined hypercholesterolemia and hypertriglyceridemia where hypercholesterolemia is the major abnormality (Type IIb hyperlipoproteinemia), it has not been studied in conditions where the major abnormality is elevation of chylomicrons, VLDL, or IDL (i.e., hyperlipoproteinemia types I, III, IV, or V).[1]

### CONTRAINDICATIONS

Active liver disease or unexplained persistent elevations of serum transaminases (See **WARNINGS**).

Concurrent treatment with gemfibrozil due to a risk for rhabdomyolysis (See **WARNINGS:** *Skeletal Muscle*).

Pregnancy and lactation: Atherosclerosis is a chronic process, and the discontinuation of lipid-lowering drugs during pregnancy should have little impact on the outcome of long-term therapy of primary hypercholesterolemia. Moreover, cholesterol and other products of the cholesterol biosynthesis pathway are essential components for fetal development, including synthesis of steroids and cell membranes. Since HMG-CoA reductase inhibitors decrease cholesterol synthesis and possibly the synthesis of other biologically active substances derived from cholesterol, they may cause fetal harm when administered to pregnant women. Therefore, HMG-CoA reductase inhibitors are contraindicated during pregnancy and in nursing mothers. ***Cerivastatin sodium should be administered to women of child-bearing age only when such patients are highly unlikely to conceive and have been informed of the potential hazards.*** If the patient becomes pregnant while taking this drug, cerivastatin sodium should be discontinued and the patient should be apprised of the potential hazard to the fetus.

Hypersensitivity to any component of this medication.

### WARNINGS

***Liver Enzymes:*** HMG-CoA reductase inhibitors have been associated with biochemical abnormalities of liver function. Persistent increases of serum transaminase (ALT, AST) values to more than 3 times the upper limit of normal (occurring on two or more not necessarily sequential occasions, regardless of baseline status) have been reported in less than 0.5% of patients treated with cerivastatin sodium in the US over an average period of 14 months. The incidence of these abnormalities was 0.2%, 0.3%, and 0.4% for BAYCOL® 0.2, 0.3, and 0.4 mg, respectively. These abnormalities usually occurred within the first 6 months of treatment, usually resolved after discontinuation of the drug, and were not associated with cholestasis. In most cases, these biochemical abnormalities were asymptomatic.

**It is recommended that liver function tests be performed before the initiation of treatment, at 6 and 12 weeks after initiation of therapy or elevation in dose, and periodically thereafter, e.g., semiannually.** Patients who develop increased transaminase levels should be monitored with a second liver function evaluation to confirm the finding and be followed thereafter with frequent liver function tests until the abnormality(ies) return to normal. Should an increase in AST or ALT of three times the upper limit of normal or greater persist, withdrawal of cerivastatin sodium therapy is recommended.

Active liver disease or unexplained transaminase elevations are contraindications to the use of BAYCOL® (cerivastatin sodium tablets) (See **CONTRAINDICATIONS**). Caution should be exercised when cerivastatin sodium is administered to patients with a history of liver disease or heavy alcohol ingestion (See **CLINICAL PHARMACOLOGY: Pharmacokinetics/Metabolism**). Such patients should be started at the low end of the recommended dosing range and closely monitored.

***Skeletal Muscle:*** **Cases of rhabdomyolysis, some with acute renal failure secondary to myoglobinuria, have been reported with cerivastatin and other drugs in this class.** Myopathy, defined as muscle aching or muscle weakness, associated with increases in plasma creatine kinase (CK) values to greater than 10 times the upper limit of normal, was rare (<0.2%) in U.S. cerivastatin clinical trials. Myopathy should be considered in any patient with diffuse myalgias, muscle tenderness or weakness, and/or marked elevation of CK. Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever. BAYCOL® (cerivastatin sodium tablets) therapy should be discontinued if markedly elevated CK levels occur or myopathy is diagnosed or suspected. **BAYCOL® (cerivastatin sodium tablets) should be temporarily withheld in any patient experiencing an acute or serious condition predisposing to the development of renal failure secondary to rhabdomyolysis, e.g., sepsis; hypotension; major surgery; trauma; severe metabolic, endocrine or electrolyte disorders; or uncontrolled epilepsy.**

The risk of myopathy during treatment with HMG-CoA reductase inhibitors is increased with concurrent administration of

BAYCORP01383029D

cyclosporine, fibric acid derivatives, erythromycin, azole antifungals or lipid-lowering doses of niacin.

Uncomplicated myalgia has been observed infrequently in patients treated with cerivastatin sodium at rates that could not be distinguished from placebo.

The combined use of HMG-CoA reductase inhibitors and fibrates generally should be avoided. The use of fibrates alone may be associated with myopathy including rhabdomyolysis and associated renal failure. The combined use of cerivastatin and gemfibrozil is contraindicated due to a risk for rhabdomyolysis (See **CONTRAINDICATIONS**).

**PRECAUTIONS**

**General:** Before instituting therapy with BAYCOL® (cerivastatin sodium tablets), an attempt should be made to control hypercholesterolemia with appropriate diet, exercise, weight reduction in obese patients, and treatment of underlying medical problems (See **INDICATIONS AND USAGE**).

Cerivastatin sodium may elevate creatine kinase and transaminase levels (See **ADVERSE REACTIONS**). This should be considered in the differential diagnosis of chest pain in a patient on therapy with cerivastatin sodium.

**Homozygous Familial Hypercholesterolemia:** Cerivastatin sodium has not been evaluated in patients with rare homozygous familial hypercholesterolemia. HMG-CoA reductase inhibitors have been reported to be less effective in these patients because they lack functional LDL receptors.

**Information for Patients:** Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever.

**Drug Interactions: Immunosuppressive Drugs, Fibric Acid Derivatives, Niacin (Nicotinic Acid), Erythromycin, Azole Antifungals:** See **WARNINGS:** *Skeletal Muscle*.

**ANTACID** (Magnesium-Aluminum Hydroxide): Cerivastatin plasma concentrations were not affected by co-administration of antacid.

**CIMETIDINE:** Cerivastatin plasma concentrations were not affected by co-administration of cimetidine.

**CHOLESTYRAMINE:** The influence of the bile-acid-sequestering agent cholestyramine on the pharmacokinetics of cerivastatin sodium was evaluated in 12 healthy males in 2 separate randomized crossover studies. In the first study, concomitant administration of 0.2 mg cerivastatin sodium and 12 g cholestyramine resulted in decreases of more than 22% for AUC and 40% for $C_{max}$ when compared to dosing cerivastatin sodium alone. However, in the second study, administration of 12 g cholestyramine 1 hour before the evening meal and 0.3 mg cerivastatin sodium approximately 4 hours after the same evening meal resulted in a decrease in the cerivastatin AUC of less than 8%, and a decrease in $C_{max}$ of about 30% when compared to dosing cerivastatin sodium alone. Therefore, it would be expected that a dosing schedule of cerivastatin sodium given at bedtime and cholestyramine given before the evening meal would not result in a significant decrease in the clinical effect of cerivastatin sodium.

**DIGOXIN:** Plasma digoxin levels and digoxin clearance at steady-state were not affected by co-administration of 0.2 mg cerivastatin sodium. Cerivastatin plasma concentrations were also not affected by co-administration of digoxin.

**WARFARIN:** Co-administration of warfarin and cerivastatin to healthy volunteers did not result in any changes in prothrombin time or clotting factor VII when compared to co-administration of warfarin and placebo. The AUC and $C_{max}$ of both the (R) and (S) isomers of warfarin were unaffected by concurrent dosing of 0.3 mg cerivastatin sodium. Co-administration of warfarin and cerivastatin did not alter the pharmacokinetics of cerivastatin sodium.

**ERYTHROMYCIN:** In hypercholesterolemic patients, steady-state cerivastatin AUC and $C_{max}$ increased approximately 50% and 24% respectively after 10 days with co-administration of erythromycin, a known inhibitor of cytochrome P450 3A4.

**ITRACONAZOLE:** In hypercholesterolemic patients, following a 0.3 mg dose of cerivastatin, steady-state cerivastatin AUC and $C_{max}$ increased 38% and 12%, respectively after 10 days with co-administration of 200 mg itraconazole, a potent inhibitor of cytochrome P450 3A4. Cerivastatin half-life was approximately 5 hours (a 64% increase) following co-administration with intraconazole, which would not lead to accumulation of cerivastatin upon multiple dosing. The administration of 0.3 mg of cerivastatin concomitantly with itraconazole has no effect on itraconazole pharmacokinetics.

**Endocrine Function:** HMG-CoA reductase inhibitors interfere with cholesterol synthesis and lower cholesterol levels and, as such, might theoretically blunt adrenal or gonadal steroid hormone production.

Clinical studies have shown that cerivastatin sodium has no adverse effect on sperm production and does not reduce basal plasma cortisol concentration, impair adrenal reserve or have an adverse effect on thyroid metabolism as assessed by TSH. Results of clinical trials with drugs in this class have been inconsistent with regard to drug effect on basal and reserve steroid levels. The effects of HMG-CoA reductase inhibitors on male fertility have not been studied in adequate numbers of male patients. The effects, if any, on the pituitary-gonadal axis in pre-menopausal women are unknown.

Patients treated with cerivastatin sodium who develop clinical evidence of endocrine dysfunction should be evaluated appropriately. Caution should be exercised if an HMG-CoA reductase inhibitor or other agent used to lower cholesterol levels is administered to patients also receiving other drugs that may decrease the levels or activity of endogenous steroid hormones, e.g., ketoconazole, spironolactone, or cimetidine.

**GEMFIBROZIL:** The potential for clinically relevant interaction between gemfibrozil and cerivastatin has not been assessed in clinical trials. However, during postmarketing surveillance, patients on cerivastatin who experienced rhabdomyolysis and associated renal failure, were in most cases also taking gemfibrozil. (See **CONTRAINDICATIONS** and **WARNINGS:** *Skeletal Muscle*)

**CNS and other Toxicities:** Chronic administration of cerivastatin to rodent and non-rodent species demonstrated the principal toxicologic targets and effects observed with other HMG-CoA reductase inhibitors: Hemorrhage and edema in multiple organs and tissues including CNS (dogs); cataracts (dogs); degeneration of muscle fibers (dogs, rats, and mice); hyperkeratosis in the non-glandular stomach (rats and mice, this organ has no human equivalent); liver lesions (dogs, rats, and mice). CNS lesions were characterized by multifocal bleeding with fibrinoid degeneration of vessel walls in the plexus chorioideus of the brain stem and in the ciliary body of the eye at 0.1 mg/kg/day in the dog. This dose resulted in plasma levels of cerivastatin ($C_{max}$), that were about 20 times higher than the mean values in humans taking 0.4 mg/day. No CNS lesions were observed after chronic treatment with cerivastatin for up to two years in the mouse ($C_{max}$ up to 10 times human exposure) and rat ($C_{max}$ in the range of human exposure).

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** A 2-year study was conducted in rats at average daily doses of cerivastatin of 0.007, 0.034, or 0.158 mg/kg. The high dosage level corresponded to plasma drug levels (AUC) in the range of human exposure after a 0.4 mg daily oral dose. Tumor incidences of treated rats were comparable to controls in all treatment groups. In a 2-year carcinogenicity study in mice with average daily doses of cerivastatin of 0.4, 1.8, 9.1, or 55 mg/kg hepatocellular adenomas were significantly increased in male and female mice at ≥ 9.1 mg/kg and hepatocellular carcinomas were significantly increased in male mice at ≥ 1.8 mg/kg. These doses were in the range of human exposure (AUC, dose of 0.4 mg/day).

No evidence of genotoxicity was observed *in vitro* with or without metabolic activation in the following assays: microbial mutagen tests using mutant strains of *S. typhimurium* or *E. coli*, Chinese Hamster Ovary Forward Mutation Assay, Unscheduled DNA Synthesis in rat primary hepatocytes, chromosome aberrations in Chinese Hamster Ovary cells, and spindle inhibition in human lymphocytes. In addition, there was no evidence of genotoxicity *in vivo* in a mouse Micronucleus Test; there was equivocal evidence of mutagenicity in a mouse Dominant Lethal Test.

In a combined male and female rat fertility study, cerivastatin had no adverse effects on fertility or reproductive performance at doses up to 0.1 mg/kg/day ($C_{max}$ in the range of human exposure). At a dose of 0.3 mg/kg/day ($C_{max}$ about 2 times human exposure), the length of gestation was marginally prolonged, stillbirths were increased, and the survival rate up to day 4 postpartum was decreased. In the fetuses (F1), a marginal reduction in fetal weight and delay in bone development was observed. In the mating of the F1 generation, there was a reduced number of female rats that littered.

In the testicles of dogs treated chronically with cerivastatin at a dose of 0.008 mg/kg/day ($C_{max}$ in the range of human exposure), atrophy, vacuolization of the germinal epithelium, spermatidic giant cells, and focal oligospermia were observed. In another 1-year study in dogs treated with 0.1 mg/kg/day ($C_{max}$ about 20 times human exposure), ejaculate volume was small and libido was decreased. Semen analysis revealed an increased number of morphologically altered spermatozoa indicating disturbances of epididymal sperm maturation that was reversible when drug administration was discontinued.

**Pregnancy: Pregnancy Category X:** (See **CONTRAINDICATIONS**): Cerivastatin caused a significant increase in incomplete ossification of the lumbar center of the vertebrae in rats at an oral dose of 0.72 mg/kg. Cerivastatin did not cause any anomalies or malformations in rabbits at oral doses up to 0.75 mg/kg. These doses resulted in plasma levels ($C_{max}$) about 5 times the human exposure (dose 0.4 mg) for rats and 3 times the human exposure ($C_{max}$) for rabbits. Cerivastatin crossed the placenta and was found in fetal liver, gastrointestinal tract, and kidneys when pregnant rats were given a single oral dose of 2 mg/kg.

Safety in pregnant women has not been established. **Cerivastatin should be administered to women of child-bearing potential only when such patients are highly unlikely to conceive and have been informed of the potential hazards.** Rare reports of congenital anomalies have been received following intrauterine exposure to other HMG-CoA reductase inhibitors. In a review of approximately 100 prospectively followed pregnancies in women exposed to simvastatin or lovastatin, the incidences of congenital anomalies, spontaneous abortions and fetal deaths/stillbirths did not exceed what would be expected in the general population. The number of cases is adequate only to exclude a three- to four-fold increase in congenital anomalies over the background incidence. In 89% of the prospectively followed pregnancies, drug treatment was initiated prior to pregnancy and was discontinued at some point in the first trimester when pregnancy was identified. As safety in pregnant women has not been established and there is no apparent benefit to therapy with BAYCOL® during pregnancy (See **CONTRAINDICATIONS**), treatment should be immediately discontinued as soon as pregnancy is recognized. If a women becomes pregnant while taking cerivastatin, the drug should be discontinued and the patient advised again as to potential hazards to the fetus.

**Nursing Mothers:** Based on preclinical data, cerivastatin is present in breast milk in a 1.3:1 ratio (milk:plasma). Because of the potential for serious adverse reactions in nursing infants, nursing women should not take cerivastatin (See **CONTRAINDICATIONS**).

**Pediatric Use:** Safety and effectiveness in pediatric patients have not been established.

**Geriatric Use:** In clinical pharmacology studies, there were no clinically relevant effects of age on the pharmacokinetics of cerivastatin sodium.

**Renal Insufficiency:** Patients with significant renal impairment ($Cl_{cr}$ ≤ 60 mL/min/1.73m²) have increased AUC (up to 60%) and $C_{max}$ (up to 23%) and should be administered BAYCOL® with caution.

***Hepatic Insufficiency:*** *Safety and effectiveness in hepatically impaired patients have not been established.* Cerivastatin should be used with caution in patients who have a history of liver disease and/or consume substantial quantities of alcohol (See **CONTRAINDICATIONS** and **WARNINGS**).

**ADVERSE REACTIONS**

Cerivastatin sodium has been evaluated for adverse events in more than 4,000 patients worldwide and is generally well-tolerated. In the U.S. placebo-controlled clinical studies, discontinuations due to adverse events occurred in 2.8% of cerivastatin sodium treated patients and in 2.2% of patients treated with placebo. Adverse reactions have usually been mild and transient.

**Clinical Adverse Experiences:** Adverse experiences occurring with a frequency ≥2% for marketed doses of cerivastatin sodium, regardless of causality assessment, in U.S. placebo-controlled clinical studies, are shown in Table 5 below:

**Table 5**
**Adverse Experiences Occurring in ≥2% of Patients in U.S. Placebo-Controlled Clinical Studies**

| | BAYCOL® (n = 1,263) | Placebo (n = 504) | | BAYCOL® (n = 1,263) | Placebo (n = 504) |
|---|---|---|---|---|---|
| Any Event | 65.3% | 64.5% | **Musculo-Skeletal** | | |
| **Body as a Whole** | | | Arthralgia | 4.4% | 3.6% |
| Headache | 9.8% | 10.7% | Myalgia | 2.3% | 1.8% |
| Accidental Injury | 5.1% | 6.3% | **Nervous** | | |
| Flu Syndrome | 4.6% | 7.7% | Dizziness | 2.1% | 2.4% |
| Abdominal Pain | 3.0% | 3.2% | Insomnia | 2.0% | 1.0% |
| Asthenia | 3.1% | 2.0% | **Respiratory** | | |
| Chest Pain | 2.2% | 2.4% | Pharyngitis | 12.7% | 15.3% |
| Back Pain | 4.0% | 4.8% | Rhinitis | 10.8% | 12.7% |
| **Digestive** | | | Sinusitis | 6.3% | 6.3% |
| Dyspepsia | 4.2% | 6.0% | Cough Increased | 2.4% | 2.2% |
| Diarrhea | 3.3% | 4.2% | Bronchitis | 1.7% | 2.8% |
| Flatulence | 2.5% | 2.6% | **Skin and Appendages** | | |
| Nausea | 2.7% | 3.2% | Rash | 3.0% | 5.4% |
| Constipation | 2.1% | 2.6% | | | |

The following effects have been reported with drugs in this class; not all effects listed below have necessarily been associated with cerivastatin therapy.

*Skeletal:* myopathy, muscle cramps, rhabdomyolysis, arthralgias, myalgia.

*Neurological:* dysfunction of certain cranial nerves (including alteration of taste, impairment of extra-ocular movement, facial paresis), tremor, dizziness, memory loss, vertigo, paresthesia, peripheral neuropathy, peripheral nerve palsy, anxiety, insomnia, depression, psychic disturbances.

*Hypersensitivity Reactions:* An apparent hypersensitivity syndrome has been reported rarely that included one or more of the following features: anaphylaxis, angioedema, lupus erythematosus-like syndrome, polymyalgia rheumatica, dermatomyositis, vasculitis, purpura, thrombocytopenia, leukopenia, hemolytic anemia, positive ANA, ESR increase, eosinophilia, arthritis, arthralgia, urticaria, asthenia, photosensitivity, fever, chills, flushing, malaise, dyspnea, toxic epidermal necrolysis, erythema multiforme, including Stevens-Johnson syndrome.

*Gastrointestinal:* pancreatitis, hepatitis, including chronic active hepatitis, cholestatic jaundice, fatty change in liver, and, rarely, cirrhosis, fulminant hepatic necrosis, and hepatoma; anorexia, vomiting.

*Skin:* alopecia, pruritus. A variety of skin changes, (e.g., nodules, discoloration, dryness of skin/mucous membranes, changes to hair/nails), have been reported.

*Reproductive:* gynecomastia, loss of libido, erectile dysfunction.

*Eye:* progression of cataracts (lens opacities), ophthalmoplegia.

*Laboratory Abnormalities:* elevated transaminases, alkaline phosphatase, γ-glutamyl transpeptidase, and bilirubin; thyroid function abnormalities.

**Post-Marketing Adverse Event Reports:** The following events have been reported since market introduction. While these events were temporally associated with the use of BAYCOL®, a casual relationship to the use of BAYCOL® cannot be readily determined due to the spontaneous nature of reporting of medical events, and the lack of controls: hepatitis, myositis, rhabdomyolysis, some with associated renal failure (most cases involved concomitant gemfibrozil), urticaria, angioedema, visual disturbance, blurred vision.

**Concomitant Therapy:** In studies where cerivastatin sodium has been administered concomitantly with cholestyramine, no adverse reactions unique to this combination or in addition to those previously reported for this class of drugs were reported. Myopathy and rhabdomyolysis (with or without acute renal failure) have been reported when HMG-CoA reductase inhibitors are used in combination with immunosuppressive drugs, fibric acid derivatives, erythromycin, azole antifungals or lipid-lowering doses of nicotinic acid. Concomitant therapy with HMG-CoA reductase inhibitors and these agents is generally not recommended (See **WARNINGS:** *Skeletal Muscle*). Concurrent treatment with gemfibrozil is contraindicated (See **CONTRAINDICATIONS** and **WARNINGS:** *Skeletal Muscle*).

**OVERDOSAGE**

The maximum single oral dose of cerivastatin sodium received by healthy volunteers and patients is 0.8 mg.

No specific recommendations concerning the treatment of an overdosage can be made. Should an overdose occur, it should be treated symptomatically and supportive measures should be undertaken as required.

Dialysis of cerivastatin sodium is not expected to significantly enhance clearance since the drug is extensively (99%) bound to plasma proteins.

**DOSAGE AND ADMINISTRATION**

The patient should be placed on a standard cholesterol-lowering diet before receiving cerivastatin sodium and should continue on this diet during treatment with cerivastatin sodium. (See NCEP Treatment Guidelines for details on dietary therapy.) The recommended dose is 0.4 mg once daily in the evening. Cerivastatin sodium may be taken with or without food. In patients with significant renal impairment (creatinine clearance ≤60 mL/min/1.73m²) lower doses are recommended.

Since the maximal effect of cerivastatin sodium is seen within 4 weeks, lipid determinations should be performed at this time.

**Concomitant Therapy:** The lipid-lowering effects on LDL-C and Total-C are additive when cerivastatin sodium is combined with a bile-acid-binding resin. When co-administering cerivastatin sodium and a bile-acid-exchange resin, e.g., cholestyramine, cerivastatin sodium should be given at least 2 hours after the resin (See also **ADVERSE REACTIONS:** *Concomitant Therapy*).

**Dosage in Patients with Renal Insufficiency:** No dose adjustment is necessary for patients with mild renal dysfunction ($Cl_{cr}$ 61-90 mL/min/1.73m²). For patients with moderate or severe renal dysfunction, a starting dose of 0.2 mg or 0.3 mg is recommended (See **CLINICAL PHARMACOLOGY** - Special Populations - Renal).

**HOW SUPPLIED**

**BAYCOL® (cerivastatin sodium tablets)** is supplied as 0.2-mg, 0.3-mg, and 0.4-mg tablets. The different tablet strengths can be identified as follows:

| Strength | Color | Markings: Front | Markings: Back |
|---|---|---|---|
| 0.2 mg | light yellow | 283 | 200 MCG |
| 0.3 mg | yellow brown | 284 | 300 MCG |
| 0.4 mg | ocher | 285 | 400 MCG |

**BAYCOL® (cerivastatin sodium tablets)** *is supplied as follows:*

| | | |
|---|---|---|
| Bottles of 30: | 0.4 mg | (NDC 0026-2885-69) |
| Bottles of 100: | 0.2 mg | (NDC 0026-2883-51) |
| | 0.3 mg | (NDC 0026-2884-51) |
| | 0.4 mg | (NDC 0026-2885-51) |

The tablets should be protected from moisture and stored below 77°F (25°C). Dispense in tight containers.

**References:**

[1] **Classification of Hyperlipoproteinemias**

| Type | Lipoproteins Elevated | Lipid Elevations: major | Lipid Elevations: minor |
|---|---|---|---|
| I (rare) | chylomicrons | TG | ↑→C |
| IIa | LDL | C | – |
| IIb | LDL,VLDL | C | TG |
| III (rare) | IDL | C/TG | – |
| IV | VLDL | TG | ↑→C |
| V (rare) | chylomicrons, VLDL | TG | ↑→C |

C=cholesterol, TG=triglycerides, LDL=low-density lipoprotein,
VLDL= very-low-density lipoprotein, IDL=intermediate-density lipoprotein.

Bayer

Bayer Corporation
Pharmaceutical Division
400 Morgan Lane
West Haven, CT 06516 USA
*Made in Germany*

℞ Only

PZ500152 12/99 © 1999 Bayer Corporation 9393 Printed in USA

# Exhibit G

# BAYCOL®
## (cerivastatin sodium tablets)

PZ500148 7/00

### DESCRIPTION

Cerivastatin sodium is sodium [S-[R*,S*-(E)]]-7-[4-(4-fluorophenyl)-5-methoxymethyl)-2,6bis(1-methylethyl)-3-pyridinyl]-3,5-dihydroxy-6-heptenoate. The empirical formula for cerivastatin sodium is $C_{26}H_{33}FNO_5Na$ and its molecular weight is 481.5. It has the following chemical structure:



Cerivastatin sodium is a white to off-white hygroscopic amorphous powder that is soluble in water, methanol, and ethanol, and very slightly soluble in acetone.

Cerivastatin sodium is an entirely synthetic, enantiomerically pure inhibitor of 3-hydroxy-3-methylglutaryl-coenzyme A (HMG-CoA) reductase. HMG-CoA reductase catalyzes the conversion of HMG-CoA to mevalonate, which is an early and rate-limiting step in the biosynthesis of cholesterol.

BAYCOL® (cerivastatin sodium tablets) is supplied as tablets containing 0.2, 0.3, 0.4 or 0.8 mg of cerivastatin sodium, for oral administration. Active Ingredient: cerivastatin sodium. Inactive Ingredients: mannitol, magnesium stearate, sodium hydroxide, crospovidone, povidone, iron oxide yellow, methylhydroxypropylcellulose, polyethylene glycol, and titanium dioxide.

### CLINICAL PHARMACOLOGY

Cholesterol and triglycerides circulate as part of lipoprotein complexes throughout the bloodstream. These complexes can be separated via ultracentrifugation into high-density lipoprotein (HDL), intermediate-density lipoprotein (IDL), low-density lipoprotein (LDL) and very-low-density lipoprotein (VLDL) fractions. In the liver, cholesterol and triglycerides (TG) are synthesized, incorporated into VLDL, and released into the plasma for delivery to peripheral tissues.

A variety of clinical studies have demonstrated that elevated levels of total cholesterol (total-C), LDL-C, and apolipoprotein B (apo-B, a membrane complex for LDL-C) promote human atherosclerosis. Similarly, decreased levels of HDL-C (and its transport complex, apolipoprotein A) are associated with the development of atherosclerosis. Epidemiologic investigations have established that cardiovascular morbidity and mortality vary directly with the level of total-C and LDL-C and inversely with the level of HDL-C.

Like LDL, cholesterol-enriched triglyceride-rich lipoproteins, including VLDL, IDL and remnants, can also promote atherosclerosis. Elevated plasma triglycerides are frequently found in a triad with low HDL-C levels and small LDL particles, as well as in association with nonlipid metabolic risk factors for coronary heart disease. As such, total plasma TG has not consistently been shown to be an independent risk factor for CHD. Furthermore, the independent effect of raising HDL or lowering TG on the risk of coronary and cardiovascular morbidity and mortality has not been determined.

In patients with hypercholesterolemia, BAYCOL® (cerivastatin sodium tablets) has been shown to reduce plasma total cholesterol, LDL-C, and apolipoprotein B. In addition, it also reduces VLDL-C and plasma triglycerides and increases plasma HDL-C and apolipoprotein A-1. The agent has no consistent effect on plasma Lp(a). The effect of BAYCOL® on cardiovascular morbidity and mortality has not been determined.

**Mechanism of Action:** Cerivastatin is a competitive inhibitor of HMG-CoA reductase, which is responsible for the conversion of 3-hydroxy-3-methyl-glutaryl-coenzyme A (HMG-CoA) to mevalonate, a precursor of sterols, including cholesterol. The inhibition of cholesterol biosynthesis by cerivastatin reduces the level of cholesterol in hepatic cells, which stimulates the synthesis of LDL receptors, thereby increasing the uptake of cellular LDL particles. The end result of these biochemical processes is a reduction of the plasma cholesterol concentration.

**Pharmacokinetics:**

**Absorption:** BAYCOL® (cerivastatin sodium tablets) is administered orally in the active form. The mean absolute bioavailability of cerivastatin following a 0.2-mg tablet oral dose is 60% (range 39 - 101%). In general, the coefficient of variation (based on the inter-subject variability) for both systemic exposure (area under the curve, AUC) and $C_{max}$ is in the 20% to 40% range. The bioavailability of cerivastatin sodium tablets is equivalent to that of a solution of cerivastatin sodium. No unchanged cerivastatin is excreted in feces. Cerivastatin exhibits linear kinetics over the dose range of 0.2 to 0.8-mg daily.

In male and female patients at steady-state, the mean maximum concentrations ($C_{max}$) following evening cerivastatin tablet doses of 0.2, 0.3, 0.4, and 0.8-mg are 2.8, 5.1, 6.2, and 12.7 μg/L, respectively. AUC values are also dose-proportional over this dose range and the mean time to maximum concentration ($t_{max}$) is approximately 2 hours for all dose strengths. Following oral administration, the terminal elimination half-life ($t_{1/2}$) for cerivastatin is 2 to 4 hours. Steady-state plasma concentrations show no evidence of cerivastatin accumulation following administration of up to 0.8 mg daily.

Results from an overnight pharmacokinetic evaluation following single-dose administration of cerivastatin with the evening meal or 4 hours after the evening meal showed that administration of cerivastatin 4 hours after the evening meal did not significantly alter either AUC or $C_{max}$ compared to dosing the drug 4 hours after the evening meal. In patients given 0.2 mg cerivastatin sodium once daily for 4 weeks, either at mealtime or at bedtime, there were no differences in the lipid-lowering effects of cerivastatin. Both regimens of 0.2 mg once daily were slightly more efficacious than 0.1 mg twice daily.

**Distribution:** The volume of distribution ($VD_{ss}$) is calculated to be 0.3 L/kg. More than 99% of the circulating drug is bound to plasma proteins (80% to albumin). Binding is reversible and independent of drug concentration up to 100 mg/L.

**Metabolism:** Biotransformation pathways for cerivastatin in humans include the following: demethylation of the pyridilic methyl ether to form M1 and hydroxylation of the methyl group in the 6'-isopropyl moiety to form M23. The combination of both reactions leads to formation of metabolite M24. The major circulating blood components are cerivastatin and the pharmacologically active M1 and M23 metabolites. The relative potencies of metabolites M1 and M23 are comparable to, but do not exceed, the potency of the parent compound. Following a 0.8-mg dose of cerivastatin to male and female patients, mean steady state $C_{max}$ values for cerivastatin, M1, and M23 were 12.7, 0.55, and 1.4 μg/L, respectively. Therefore, the cholesterol-lowering effect is due primarily to the parent compound, cerivastatin.

**Excretion:** Cerivastatin itself is not found in either urine or feces; M1 and M23 are the major metabolites excreted by these routes. Following an oral dose of 0.4 mg $^{14}C$-cerivastatin to healthy volunteers, excretion of radioactivity is about 24% in the urine and 70% in the feces. The parent compound, cerivastatin, accounts for less than 2% of the total radioactivity excreted. The plasma clearance for cerivastatin in humans after intravenous dosing is 12 to 13 liters per hour.

**Special Populations**

**Geriatric:** Plasma concentrations of cerivastatin are similar in healthy elderly male subjects (>65 years) and in young males (<40 years).

**Gender:** Plasma concentrations of cerivastatin in females are slightly higher than in males (approximately 12% higher for $C_{max}$ and 16% higher for AUC).

**Pediatric:** Cerivastatin pharmacokinetics have not been studied in pediatric patients.

**Race:** Cerivastatin pharmacokinetics were compared across studies in Caucasian, Japanese and Black subjects. No significant differences in AUC, $C_{max}$, $t_{max}$, and $t_{1/2}$ were found.

**Renal:** Steady-state plasma concentrations of cerivastatin are similar in healthy volunteers ($Cl_{cr}$>90 mL/min/1.73m²) and in patients with mild renal impairment ($Cl_{cr}$ 61-90 mL/min/1.73m²). In patients with moderate ($Cl_{cr}$ 31-60 mL/min/1.73m²) or severe ($Cl_{cr}$ ≤ 30 mL/min/1.73m²) renal impairment, AUC is up to 60% higher, $C_{max}$ up to 23% higher, and $t_{1/2}$ up to 47% longer compared to subjects with normal renal function.

**Hemodialysis:** While studies have not been conducted in patients with end-stage renal disease, hemodialysis is not expected to significantly enhance clearance of cerivastatin since the drug is extensively bound to plasma proteins.

**Hepatic:** Cerivastatin has not been studied in patients with active liver disease (see **CONTRAINDICATIONS**). Caution should be exercised when BAYCOL® (cerivastatin sodium tablets) is administered to patients with a history of liver disease or heavy alcohol ingestion (see **WARNINGS**).

**Clinical Studies:** BAYCOL® (cerivastatin sodium tablets) has been studied in controlled trials in North America, Europe, Israel, and South Africa and has been shown to be effective in reducing plasma Total-C, LDL-C, VLDL-C, apo B, and TG and increasing HDL-C and apo A1 in patients with heterozygous familial and non-familial forms of hypercholesterolemia and in mixed dyslipidemia. Over 5,000 patients with Type IIa and IIb hypercholesterolemia were treated in trials of 4 to 104 weeks duration.

The effectiveness of BAYCOL® in lowering plasma cholesterol has been shown in men and women, in patients with and without elevated triglycerides, and in the elderly. In four large, multicenter, placebo-controlled dose response studies in patients with primary hypercholesterolemia, BAYCOL® given as a single daily dose over 8 weeks, significantly reduced Total-C, LDL-C, apo B, TG, total cholesterol/HDL cholesterol (Total-C/HDL-C) ratio and LDL cholesterol/HDL cholesterol (LDL-C/HDL-C) ratio. Significant increases in HDL-C were also observed. The median (25th and 75th percentile) percent changes from baseline in HDL-C for Baycol 0.2, 0.3, 0.4, and 0.8 mg were +8 (+1, +15), +8 (+1, +14), +7 (0, +14), and +9 (+2, +16), respectively. Significant reductions in mean total-C and LDL-C were evident after one week, peaked at four weeks, and were maintained for the duration of the trial. (Pooled results at week 8 are presented in Table 1).

**Table 1**
**Response in Patients with Primary Hypercholesterolemia**
**Mean Percent Change from Baseline to Week 8**
**Intent-To-Treat Population**

| Dosage | N[1] | Total-C | LDL-C | Apo-B | TG[2] | HDL-C | LDL-C/HDL-C | Total-C/HDL-C |
|---|---|---|---|---|---|---|---|---|
| Placebo | 608-620 | +1 | 0 | +1 | 0 | +2 | −1 | 0 |
| **BAYCOL® qd** | | | | | | | | |
| 0.2 mg | 150-151 | −18 | −25 | −19 | −16 | +9 | −31 | −24 |
| 0.3 mg | 494-497 | −22 | −31 | −24 | −16 | +8 | −35 | −27 |
| 0.4 mg | 754-758 | −24 | −34 | −27 | −16 | +7 | −38 | −29 |
| 0.8 mg | 731-735 | −30 | −42 | −33 | −22 | +9 | −46 | −35 |

1 - N given as a range since test results for each lipid variable were not available in every patient
2 - Median percent change from baseline

In a pool of eight studies in patients with hypercholesterolemia and TG levels ranging from 250 mg/dL to 500 mg/dL who were treated for at least eight weeks, the following reductions in TG and increases in HDL-C were observed at Week 8 as shown in Table 2 below:

**Table 2**
**Median Percent Change from Baseline to Week 8**
**in Patients with Baseline TG between 250-500 mg/dL**

| | Placebo | BAYCOL® 0.2 mg | BAYCOL® 0.3 mg | BAYCOL® 0.4 mg | BAYCOL® 0.8 mg |
|---|---|---|---|---|---|
| N[1] | 135-138 | 127-129 | 156-157 | 139 | 125 |
| Triglycerides | −3.3 | −22.6 | −22.4 | −26.2 | −30.7 |
| HDL-C | 3.1 | 7.3 | 9.2 | 10.7 | 13.3 |

1 - N given as a range since test results for each lipid variable were not available in every patient

In a large clinical study, the number of patients meeting their National Cholesterol Education Program-Adult Treatment Panel (NCEP-ATP) II target LDL-C levels on BAYCOL® 0.4 and 0.8 mg daily was assessed. The results up to 24 weeks are shown in Table 3 below:

**Table 3**
**Percent of Patients Reaching NCEP-ATP II Goal**
**Up to 24 Weeks of Treatment with BAYCOL® 0.4 mg and 0.8 mg**

| NCEP-ATP II Treatment Guidelines | | | Patients Reaching LDL-C Target Up to 24 Weeks | | | |
|---|---|---|---|---|---|---|
| Risk Factors for CHD | Baseline LDL-C (mg/dL) | Target LDL-C (mg/dL) | BAYCOL® 0.4 mg | | BAYCOL® 0.8 mg | |
| | | | Baseline LDL-C Mean (mg/dL) | Percent To Goal | Baseline LDL-C Mean (mg/dL) | Percent To Goal |
| < 2 risk factors | ≥ 190 | < 160 | 234 (n=33) | 79% | 224 (n=156) | 79% |
| ≥ 2 risk factors | ≥ 160 | < 130 | 204 (n=43) | 65% | 201 (n=186) | 72% |
| CHD | ≥ 130 | ≤ 100 | 188 (n=34) | 24% | 187 (n=99) | 53% |

### INDICATIONS AND USAGE

BAYCOL® (cerivastatin sodium tablets) is indicated as an adjunct to diet to reduce elevated Total-C, LDL-C, apo B, and TG and to increase HDL-C levels in patients with primary hypercholesterolemia and mixed dyslipidemia (Fredrickson Types IIa and IIb) when the response to dietary restriction of saturated fat and cholesterol and other non-pharmacological measures alone has been inadequate. Therapy with lipid-altering drugs should be a component of multiple risk factor intervention in those patients at significantly high risk for atherosclerotic vascular disease due to hypercholesterolemia.

Before considering therapy with lipid-altering agents, secondary causes of hypercholesterolemia, e.g., poorly controlled diabetes mellitus, hypothyroidism, nephrotic syndrome, dysproteinemias, obstructive liver disease, other drug therapy, alcoholism, should be excluded and a lipid profile performed to measure Total-C, HDL-C, and triglycerides (TG). For patients with TG of 400 mg/dL or less, LDL-C can be estimated using the following equation:

LDL-C = [Total-C] minus [HDL-C + TG/5]

For TG levels > 400 mg/dL, this equation is less accurate and LDL-C concentrations should be directly measured by preparative ultracentrifugation. In many hypertriglyceridemic patients, LDL-C may be low or normal despite elevated Total-C. In such cases, BAYCOL® (cerivastatin sodium tablets) is not indicated.

Lipid determinations should be performed at intervals of no less than four weeks.

The National Cholesterol Education Program (NCEP) Treatment Guidelines are summarized in Table 4.

**Table 4**
**National Cholesterol Education Program (NCEP) Treatment Guidelines**
**LDL-Cholesterol mg/dL (mmol/L)**

| Definite Atherosclerotic Disease* | Two or More Other Risk Factors** | Initiation Level*** | Goal |
|---|---|---|---|
| NO | NO | ≥ 190 (≥ 4.9) | < 160 (<4.1) |
| NO | YES | ≥ 160 (≥ 4.1) | < 130 (<3.4) |
| YES | YES or NO | ≥ 130 (≥ 3.4) | ≤ 100 (≤2.6) |

* Coronary heart disease or peripheral vascular disease (including symptomatic carotid artery disease).
** Other risk factors for coronary heart disease (CHD) include the following: age (males: ≥ 45 years; females: ≥ 55 years or premature menopause without estrogen replacement therapy); family history of premature CHD; current cigarette smoking; hypertension; confirmed HDL-C < 35 mg/dL (< 0.91 mmol/L); and diabetes mellitus. Subtract one risk factor if HDL-C is ≥ 60 mg/dL (≥ 1.6 mmol/L).
*** In CHD patients with LDL-C levels 100-129 mg/dL, the physician should exercise clinical judgment in deciding whether to initiate drug treatment.

At the time of hospitalization for an acute coronary event, consideration can be given to initiating drug therapy at discharge if the LDL-C level is ≥ 130 mg/dL (NCEP-ATP II).

Since the goal of treatment is to lower LDL-C, the NCEP recommends that LDL-C levels be used to initiate and assess treatment response. Only if LDL-C levels are not available, should the Total-C be used to monitor therapy.

Although BAYCOL® may be useful to reduce elevated LDL-cholesterol levels in patients with combined hypercholesterolemia and hypertriglyceridemia where hypercholesterolemia is the major abnormality (Type IIb hyperlipoproteinemia), it has not been studied in conditions where the major abnormality is elevation of chylomicrons, VLDL, or IDL (i.e., hyperlipoproteinemia types I, III, IV, or V).[1]

### CONTRAINDICATIONS

Active liver disease or unexplained persistent elevations of serum transaminases (see **WARNINGS**).

**Concurrent treatment with gemfibrozil due to a risk for rhabdomyolysis (see WARNINGS: Skeletal Muscle).**

Pregnancy and lactation: Atherosclerosis is a chronic process, and the discontinuation of lipid-lowering drugs during pregnancy should have little impact on the outcome of long-term therapy of primary hypercholesterolemia. Moreover, cholesterol and other products of the cholesterol biosynthesis pathway are essential components for fetal development, including synthesis of steroids and cell membranes. Since HMG-CoA reductase inhibitors decrease cholesterol synthesis and possibly the synthesis of other biologically active substances derived from cholesterol, they may cause fetal harm when administered to pregnant women. Therefore, HMG-CoA reductase inhibitors are contraindicated during pregnancy and in nursing mothers. **Cerivastatin sodium should be administered to women of child-bearing age only when such patients are highly unlikely to conceive and have been informed of the potential hazards.** If the patient becomes pregnant while taking this drug, cerivastatin sodium should be discontinued and the patient should be apprised of the potential hazard to the fetus.

Hypersensitivity to any component of this medication.

### WARNINGS

***Liver Enzymes:*** HMG-CoA reductase inhibitors have been associated with biochemical abnormalities of liver function. Persistent increases of serum transaminase (ALT, AST) values to more than 3 times the upper limit of normal (occurring on two or more not necessarily sequential occasions, regardless of baseline status) have been reported in 0.5% of patients treated with cerivastatin sodium in the US over an average period of 11 months. The incidence of these abnormalities was 0.1%, 0.4%, 0.9% and 0.6% for BAYCOL® 0.2, 0.3, 0.4, and 0.8 mg respectively. These abnormalities usually occurred within the first 6 months of treatment, usually resolved after discontinuation of the drug, and were not associated with cholestasis. In most cases, these biochemical abnormalities were asymptomatic.

**It is recommended that liver function tests be performed before the initiation of treatment, at 6 and 12 weeks after initiation of therapy or elevation in dose, and periodically thereafter, e.g., semiannually.** Patients who develop increased transaminase levels should be monitored with a second liver function evaluation to confirm the finding and be followed thereafter with frequent liver function tests until the abnormality(ies) return to normal. Should an increase in AST or ALT of three times the upper limit of normal or greater persist, withdrawal of cerivastatin sodium therapy is recommended.

Active liver disease or unexplained transaminase elevations are contraindications to the use of BAYCOL® (cerivastatin sodium tablets) (see **CONTRAINDICATIONS**). Caution should be exercised when cerivastatin sodium is administered to patients with a history of liver disease or heavy alcohol ingestion (see **CLINICAL PHARMACOLOGY: Pharmacokinetics/Metabolism**). Such patients should be started at the low end of the recommended dosing range and closely monitored.

***Skeletal Muscle:* Cases of rhabdomyolysis, some with acute renal failure secondary to myoglobinuria, have been reported with cerivastatin and other drugs in this class.** Myopathy, defined as muscle aching or muscle weakness, associated with increases in plasma creatine kinase (CK) values to greater than 10 times the upper limit of normal, was seen in 0.4% of patients in U.S. cerivastatin clinical trials. In one clinical study using BAYCOL 0.8 mg as the starting dose, women over 65 years of age, especially those with low body weight, were observed to be at an increased risk of myopathy. Myopathy should be considered in any patient with diffuse myalgias, muscle tenderness or weakness, and/or marked elevation of CK. Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever. BAYCOL® (cerivastatin sodium tablets) therapy should be discontinued if markedly elevated CK levels occur or myopathy is diagnosed or suspected. **BAYCOL® (cerivastatin sodium tablets) should be temporarily withheld in any patient experiencing an acute or serious condition predisposing to the development of renal failure secondary to rhabdomyolysis, e.g., sepsis; hypotension; major surgery; trauma; severe metabolic, endocrine or electrolyte disorders; or uncontrolled epilepsy.**

The risk of myopathy during treatment with HMG-CoA reductase inhibitors is increased with concurrent administration of cyclosporine, fibric acid derivatives, erythromycin, azole antifungals or lipid-lowering doses of niacin.

The combined use of HMG-CoA inhibitors and fibrates generally should be avoided. The use of fibrates alone may be associated with myopathy including rhabdomyolysis and associated renal failure. **The combined use of cerivastatin and gemfibrozil is contraindicated due to a risk for rhabdomyolysis (see Contraindications).**

### PRECAUTIONS

**General:** Before instituting therapy with BAYCOL® (cerivastatin sodium tablets), an attempt should be made to control

BAYCORP01403086D

hypercholesterolemia with appropriate diet, exercise, weight reduction in obese patients, and treatment of underlying medical problems (see **INDICATIONS AND USAGE**).

Cerivastatin sodium may elevate creatine kinase and transaminase levels (see **ADVERSE REACTIONS**). This should be considered in the differential diagnosis of chest pain in a patient on therapy with cerivastatin sodium.

**Homozygous Familial Hypercholesterolemia:** Cerivastatin sodium has not been evaluated in patients with rare homozygous familial hypercholesterolemia. HMG-CoA reductase inhibitors have been reported to be less effective in these patients because they lack functional LDL receptors.

**Information for Patients:** Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever.

**DRUG INTERACTIONS:**

**Immunosuppressive Drugs, Fibric Acid Derivatives, Niacin (Nicotinic Acid), Erythromycin, Azole Antifungals:** see **WARNINGS: Skeletal Muscle.**

**ANTACID** (Magnesium-Aluminum Hydroxide): Cerivastatin plasma concentrations were not affected by co-administration of antacid.

**CIMETIDINE:** Cerivastatin plasma concentrations were not affected by co-administration of cimetidine.

**CHOLESTYRAMINE:** The influence of the bile-acid-sequestering agent cholestyramine on the pharmacokinetics of cerivastatin sodium was evaluated in 12 healthy males in 2 separate randomized crossover studies. In the first study, concomitant administration of 0.2 mg cerivastatin sodium and 12 g cholestyramine resulted in decreases of more than 22% for AUC and 40% for $C_{max}$ when compared to dosing cerivastatin sodium alone. However, in the second study, administration of 12 g cholestyramine 1 hour before the evening meal and 0.3 mg cerivastatin sodium approximately 4 hours after the same evening meal resulted in a decrease in the cerivastatin AUC of less than 8%, and a decrease in $C_{max}$ of about 30% when compared to dosing cerivastatin sodium alone. Therefore, it would be expected that a dosing schedule of cerivastatin sodium given at bedtime and cholestyramine given before the evening meal would not result in a significant decrease in the clinical effect of cerivastatin sodium.

**DIGOXIN:** Plasma digoxin levels and digoxin clearance at steady-state were not affected by co-administration of 0.2 mg cerivastatin sodium. Cerivastatin plasma concentrations were also not affected by co-administration of digoxin.

**WARFARIN:** Co-administration of warfarin and cerivastatin to healthy volunteers did not result in any changes in prothrombin time or clotting factor VII when compared to co-administration of warfarin and placebo. The AUC and $C_{max}$ of both the (R) and (S) isomers of warfarin were unaffected by concurrent dosing of 0.3 mg cerivastatin sodium. Co-administration of warfarin and cerivastatin did not alter the pharmacokinetics of cerivastatin sodium.

**ERYTHROMYCIN:** In hypercholesterolemic patients, steady-state cerivastatin AUC and $C_{max}$ increased approximately 50% and 24% respectively after 10 days with co-administration of erythromycin, a known inhibitor of cytochrome P450 3A4.

**ITRACONAZOLE:** In hypercholesterolemic patients, following a 0.3 mg dose of cerivastatin, steady-state cerivastatin AUC and $C_{max}$ increased 38% and 12%, respectively after 10 days with co-administration of 200 mg itraconazole, a potent inhibitor of cytochrome P450 3A4. Cerivastatin half-life was approximately 5 hours (a 64% increase) following co-administration with itraconazole, which would not lead to accumulation of cerivastatin upon multiple dosing. The administration of 0.3 mg of cerivastatin concomitantly with itraconazole has no effect on itraconazole pharmacokinetics.

In a single dose crossover study using 0.8 mg cerivastatin, the AUC and $C_{max}$ of cerivastatin were increased 27% and 25% respectively during concomitant itraconazole treatment.

**Endocrine Function:** HMG-CoA reductase inhibitors interfere with cholesterol synthesis and lower cholesterol levels and, as such, might theoretically blunt adrenal or gonadal steroid hormone production.

Clinical studies have shown that cerivastatin sodium has no adverse effect on sperm production and does not reduce basal plasma cortisol concentration, impair adrenal reserve or have an adverse effect on thyroid metabolism as assessed by TSH. Results of clinical trials with drugs in this class have been inconsistent with regard to drug effect on basal and reserve steroid levels. The effects of HMG-CoA reductase inhibitors on male fertility have not been studied in adequate numbers of male patients. The effects, if any, on the pituitary-gonadal axis in pre-menopausal women are unknown.

Patients treated with cerivastatin sodium who develop clinical evidence of endocrine dysfunction should be evaluated appropriately. Caution should be exercised if an HMG-CoA reductase inhibitor or other agent used to lower cholesterol levels is administered to patients also receiving other drugs that may decrease the levels or activity of endogenous steroid hormones, e.g., ketoconazole, spironolactone, or cimetidine.

**GEMFIBROZIL:** The potential for clinically relevant interaction between gemfibrozil and cerivastatin has not been assessed in clinical trials. However, during postmarketing surveillance, patients on cerivastatin who experienced rhabdomyolysis and associated renal failure, were in most cases also taking gemfibrozil. (See **CONTRAINDICATIONS** and **WARNINGS: Skeletal Muscle**)

**CNS and other Toxicities:** Chronic administration of cerivastatin to rodent and non-rodent species demonstrated the principal toxicologic targets and effects observed with other HMG-CoA reductase inhibitors: Hemorrhage and edema in multiple organs and tissues including CNS (dogs); cataracts (dogs); degeneration of muscle fibers (dogs, rats, and mice); hyperkeratosis in the non-glandular stomach (rats and mice, this organ has no human equivalent); liver lesions (dogs, rats, and mice).

CNS lesions were characterized by multifocal bleeding with fibrinoid degeneration of vessel walls in the plexus chorioideus of the brain stem and in the ciliary body of the eye at 0.1 mg/kg/day in the dog. This dose resulted in plasma levels of cerivastatin ($C_{max}$, measured as free drug), that were about 17 times higher than the mean values in humans taking 0.8 mg/day. No CNS lesions were observed after chronic treatment with cerivastatin for up to two years in the mouse (up to 6 times human $C_{max\ free}$ drug levels) and rat (in the range of human $C_{max\ free}$ drug levels).

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** A 2-year study was conducted in rats with dietary administration resulting in average daily doses of cerivastatin of 0.007, 0.034, or 0.158 mg/kg. The high dosage level corresponded to plasma free drug levels (AUC) of approximately 2 times those in humans following a 0.8-mg oral dose. Tumor incidences of treated rats were comparable to controls in all treatment groups. In a 2-year carcinogenicity study conducted in mice with dietary administration resulting in average daily doses of cerivastatin of 0.4, 1.8, 9.1, or 55 mg/kg hepatocellular adenomas were significantly increased in male and female mice at ≥ 9.1 mg/kg ($AUC_{free}$ values about 3 times human at 0.8 mg/day). Hepatocellular carcinomas were significantly increased in male mice at ≥ 1.8 mg/k ($AUC_{free}$ values in the range of human exposure at 0.8 mg/day).

No evidence of genotoxicity was observed *in vitro* with or without metabolic activation in the following assays: microbial mutagen tests using mutant strains of *S. typhimurium* or *E. coli*, Chinese Hamster Ovary Forward Mutation Assay, Unscheduled DNA Synthesis in rat primary hepatocytes, chromosome aberrations in Chinese Hamster Ovary cells, and spindle inhibition in human lymphocytes. In addition, there was no evidence of genotoxicity *in vivo* in a mouse Micronucleus Test; there was equivocal evidence of mutagenicity in a mouse Dominant Lethal Test.

In a combined male and female rat fertility study, cerivastatin had no adverse effects on fertility or reproductive performance at doses up to 0.1 mg/kg/day (in the range of human $C_{max\ free}$ drug levels). At a dose of 0.3 mg/kg/day (about 3 times human $C_{max\ free}$ drug levels), the length of gestation was marginally prolonged, stillbirths were increased, and the survival rate up to day 4 postpartum was decreased. In the fetuses (F1), a marginal reduction in fetal weight and delay in bone development was observed. In the mating of the F1 generation, there was a reduced number of female rats that littered.

In the testicles of dogs treated chronically with cerivastatin at a dose of 0.008 mg/kg/day (in the range of human $C_{max\ free}$ drug levels), atrophy, vacuolization of the germinal epithelium, spermatidic giant cells, and focal oligospermia were observed. In another 1-year study in dogs treated with 0.1 mg/kg/day (approximately 17-fold the human exposure at doses of 0.8 mg based on $C_{max\ free}$), ejaculate volume was small and libido was decreased. Semen analysis revealed an increased number of morphologically altered spermatozoa indicating disturbances of epididymal sperm maturation that was reversible when drug administration was discontinued.

**Pregnancy: Pregnancy Category X:** (See **CONTRAINDICATIONS**): Cerivastatin caused a significant increase in incomplete ossification of the lumbar center of the vertebrae in rats at an oral dose of 0.72 mg/kg. Cerivastatin did not cause any anomalies or malformations in rabbits at oral doses up to 0.75 mg/kg. These doses resulted in plasma levels about 6 times the human exposure ($C_{max\ free}$) for rats and 3 times the human exposure for rabbits ($C_{max\ free}$) at a human dose of 0.8 mg. Cerivastatin crossed the placenta and was found in fetal liver, gastrointestinal tract, and kidneys when pregnant rats were given a single oral dose of 2 mg/kg.

Safety in pregnant women has not been established. Cerivastatin should be administered to women of child-bearing potential only when such patients are highly unlikely to conceive and have been informed of the potential hazards. Rare reports of congenital anomalies have been received following intrauterine exposure to other HMG-CoA reductase inhibitors. In a review of approximately 100 prospectively followed pregnancies in women exposed to simvastatin or lovastatin, the incidences of congenital anomalies, spontaneous abortions and fetal deaths/stillbirths did not exceed what would be expected in the general population. The number of cases is adequate only to exclude a three- to four-fold increase in congenital anomalies over the background incidence. In 89% of the prospectively followed pregnancies, drug treatment was initiated prior to pregnancy and was discontinued at some point in the first trimester when pregnancy was identified. As safety in pregnant women has not been established and there is no apparent benefit to therapy with BAYCOL® during pregnancy (see **CONTRAINDICATIONS**), treatment should be immediately discontinued as soon as pregnancy is recognized. If a women becomes pregnant while taking cerivastatin, the drug should be discontinued and the patient advised again as to potential hazards to the fetus.

**Nursing Mothers:** Based on preclinical data, cerivastatin is present in breast milk in a 1.3:1 ratio (milk:plasma). Because of the potential for serious adverse reactions in nursing infants, nursing women should not take cerivastatin (see **CONTRAINDICATIONS**).

**Pediatric Use:** Safety and effectiveness in pediatric patients have not been established.

**Geriatric Use:** In clinical pharmacology studies, there were no clinically relevant effects of age on the pharmacokinetics of cerivastatin sodium. In one clinical study using BAYCOL 0.8 mg as the starting dose, women over 65 years of age, especially those with low body weight, were observed to be at an increased risk of myopathy. Caution should be exercised when titrating such patients to the 0.8 mg dose of BAYCOL.

**Renal Insufficiency:** Patients with significant renal impairment ($Cl_{cr}$ ≤ 60 mL/min/1.73m²) have increased AUC (up to 60%) and $C_{max}$ (up to 23%) and should be administered BAYCOL® with caution.

**Hepatic Insufficiency:** Safety and effectiveness in hepatically impaired patients have not been established. Cerivastatin should be used with caution in patients who have a history of liver disease and/or consume substantial quantities of alcohol (see **CONTRAINDICATIONS** and **WARNINGS**).

### ADVERSE REACTIONS

Cerivastatin sodium has been evaluated for adverse events in more than 5,000 patients worldwide. In the U.S. placebo-controlled clinical studies, discontinuations due to adverse events occurred in 3.1% of cerivastatin sodium treated patients and in 2.0% of patients treated with placebo. Adverse reactions have usually been mild and transient.

**Clinical Adverse Experiences:** Adverse experiences occurring with a frequency ≥2% for marketed doses of cerivastatin sodium, regardless of causality assessment, in U.S. placebo-controlled clinical studies, are shown in Table 5 below:

**Table 5**
**Adverse Experiences occurring in ≥2% Patients in U.S. Placebo Controlled Clinical Studies**

| Adverse Event | BAYCOL® (n = 2231) | Placebo (n = 702) | Adverse Event | BAYCOL® (n = 2231) | Placebo (n = 702) |
|---|---|---|---|---|---|
| Any event | 63.2% | 63.0% | Diarrhea | 3.3% | 3.3% |
| Pharyngitis | 9.6% | 12.1% | Rash | 3.0% | 4.4% |
| Headache | 8.5% | 9.5% | Myalgia | 2.5% | 2.3% |
| Rhinitis | 8.3% | 10.1% | Abdominal pain | 2.5% | 3.0% |
| Sinusitis | 4.7% | 5.0% | Nausea | 2.4% | 3.1% |
| Accidental injury | 4.4% | 5.6% | Leg pain | 2.2% | 1.4% |
| Arthralgia | 4.3% | 3.4% | Constipation | 2.2% | 2.0% |
| Dyspepsia | 3.8% | 4.8% | Dizziness | 2.1% | 2.4% |
| Flu syndrome | 3.7% | 6.3% | Flatulence | 2.1% | 2.7% |
| Back pain | 3.4% | 5.0% | Chest pain | 2.0% | 1.8% |
| Asthenia | 3.4% | 2.1% | Bronchitis | 1.3% | 2.1% |

The following effects have been reported with drugs in this class; not all effects listed below have necessarily been associated with cerivastatin therapy.

*Skeletal:* myopathy, muscle cramps, rhabdomyolysis, arthralgias, myalgia.

*Neurological:* dysfunction of certain cranial nerves (including alteration of taste, impairment of extra-ocular movement, facial paresis), tremor, dizziness, memory loss, vertigo, paresthesia, peripheral neuropathy, peripheral nerve palsy, anxiety, insomnia, depression, psychic disturbances.

*Hypersensitivity Reactions:* An apparent hypersensitivity syndrome has been reported that included one or more of the following features: anaphylaxis, angioedema, lupus erythematosus-like syndrome, polymyalgia rheumatica, dermatomyositis, vasculitis, purpura, thrombocytopenia, leukopenia, hemolytic anemia, positive ANA, ESR increase, eosinophilia, arthritis, arthralgia, urticaria, asthenia, photosensitivity, fever, chills, flushing, malaise, dyspnea, toxic epidermal necrolysis, erythema multiforme, including Stevens-Johnson syndrome.

*Gastrointestinal:* pancreatitis, hepatitis, including chronic active hepatitis, cholestatic jaundice, fatty change in liver, cirrhosis, fulminant hepatic necrosis, and hepatoma; anorexia, vomiting.

*Skin:* alopecia, pruritus. A variety of skin changes, (e.g., nodules, discoloration, dryness of skin/mucous membranes, changes to hair/nails), have been reported.

*Reproductive:* gynecomastia, loss of libido, erectile dysfunction.

*Eye:* progression of cataracts (lens opacities), ophthalmoplegia.

*Laboratory Abnormalities:* elevated transaminases, creatine kinase, alkaline phosphatase, γ-glutamyl transpeptidase, and bilirubin; thyroid function abnormalities.

**Post-Marketing Adverse Event Reports:** The following events have been reported since market introduction. While these events were generally associated with the use of BAYCOL®, a casual relationship to the use of BAYCOL® cannot be readily determined due to the spontaneous nature of reporting of medical events, and the lack of controls.

**Body as a Whole:** Asthenia, fever, headache, anorexia, abdominal pain, epistaxis, edema.

**Cardiovascular System:** Hypertension, angina pectoris.

**Digestive System:** Colitis, constipation, diarrhea, duodenal ulcer, dyspepsia, flatulance, gastrointestinal disorder, gastrointestinal hemorrhage, hepatitis, nausea.

**Hemolytic and Lymphatic System:** Anemia, leukopenia.

**Hypersensitivity Reaction:** Allergic reaction, anaphylactoid reaction, angioedema, urticaria.

**Nervous System:** Paralysis, somnolence.

**Musculoskeletal System:** Myalgia, myasthenia, myopathy, myositis, rhabdomyolysis, hypertonia, hyperkinesia.

**Respiratory System:** Cough increase.

**Urogenital System:** Acute renal failure secondary to myoglobinuria.

**Special Senses:** Cataract specified, visual disturbance, blurred vision.

**Laboratory Abnormalities:** Amylase increase, elevated transaminases, laboratory tests abnormal, kidney function abnormal, creatine phosphokinase increase.

**Concomitant Therapy:** In studies where cerivastatin sodium has been administered concomitantly with cholestyramine, no adverse reactions unique to this combination or in addition to those previously reported for this class of drugs were reported. Myopathy and rhabdomyolysis (with or without acute renal failure) have been reported when HMG-CoA reductase inhibitors are used in combination with immunosuppressive drugs, fibric acid derivatives, erythromycin, azole antifungals or lipid-lowering doses of nicotinic acid. Concomitant therapy with HMG-CoA reductase inhibitors and these agents is generally not recommended (see **WARNINGS: Skeletal Muscle**). Concurrent treatment with gemfibrozil is contraindicated (see **CONTRAINDICATIONS** and **WARNINGS: Skeletal Muscle**).

### OVERDOSAGE

No specific recommendations concerning the treatment of an overdosage can be made. Should an overdose occur, it should be treated symptomatically and supportive measures should be undertaken as required.

Dialysis of cerivastatin sodium is not expected to significantly enhance clearance since the drug is extensively (>99%) bound to plasma proteins.

### DOSAGE AND ADMINISTRATION

The patient should be placed on a standard cholesterol-lowering diet before receiving cerivastatin sodium and should continue on this diet during treatment with cerivastatin sodium. (See NCEP Treatment Guidelines for details on dietary therapy.)

The recommended starting-dose of BAYCOL® is 0.4 mg once daily in the evening. The dosage range is 0.2 mg to 0.8 mg. Cerivastatin sodium may be taken with or without food. In patients with significant renal impairment (creatinine clearance ≤60 mL/min/1.73m²) the lower doses are recommended.

Since the maximal effect of cerivastatin sodium is seen within 4 weeks, lipid determinations should be performed at this time and dose adjusted as necessary.

**Concomitant Therapy:** The lipid-lowering effects on LDL-C and Total-C are additive when cerivastatin sodium is combined with a bile-acid-binding resin. When co-administering cerivastatin sodium and a bile-acid-exchange resin, e.g., cholestyramine, cerivastatin sodium should be given at least 2 hours after the resin (see also **ADVERSE REACTIONS: Concomitant Therapy**).

**Dosage in Patients with Renal Insufficiency:** No dose adjustment is necessary for patients with mild renal dysfunction ($Cl_{cr}$ 61-90 mL/min/1.73m²). For patients with moderate or severe renal dysfunction, a starting dose of 0.2 mg or 0.3 mg is recommended (see **CLINICAL PHARMACOLOGY - Special Populations - Renal**).

### HOW SUPPLIED

**BAYCOL® (cerivastatin sodium tablets)** is supplied as 0.2-mg, 0.3-mg, 0.4-mg and 0.8-mg tablets. The different tablet strengths can be identified as follows:

| Strength | Color | Markings: Front | Markings: Back |
|---|---|---|---|
| 0.2 mg | light yellow | 283 | 200 MCG |
| 0.3 mg | yellow brown | 284 | 300 MCG |
| 0.4 mg | ocher | 285 | 400 MCG |
| 0.8 mg | brown orange | 286 | 800 MCG |

**BAYCOL® (cerivastatin sodium tablets)** is supplied as follows:

| | | |
|---|---|---|
| Bottles of 30: | 0.4 mg | (NDC 0026-2885-69) |
| | 0.8 mg | (NDC 0026-2886-69) |
| Bottles of 90: | 0.2 mg | (NDC 0026-2883-86) |
| | 0.3 mg | (NDC 0026-2884-86) |
| | 0.4 mg | (NDC 0026-2885-86) |
| | 0.8 mg | (NDC 0026-2886-86) |
| Bottles of 100: | 0.2 mg | (NDC 0026-2883-51) |
| | 0.3 mg | (NDC 0026-2884-51) |
| | 0.4 mg | (NDC 0026-2885-51) |

The tablets should be protected from moisture and stored below 77°F (25°C). Dispense in tight containers.

**References:**

[1] **Classification of Hyperlipoproteinemias**

| Type | Lipoproteins Elevated | Lipid Elevations: major | Lipid Elevations: minor |
|---|---|---|---|
| I (rare) | chylomicrons | TG | ↑→C |
| IIa | LDL | C | – |
| IIb | LDL,VLDL | C | TG |
| III (rare) | IDL | C/TG | – |
| IV | VLDL | TG | ↑→C |
| V (rare) | chylomicrons, VLDL | TG | ↑→C |

C=cholesterol, TG=triglycerides, LDL=low-density lipoprotein,
VLDL= very-low-density lipoprotein, IDL=intermediate-density lipoprotein.

Bayer

Bayer Corporation
Pharmaceutical Division
400 Morgan Lane
West Haven, CT 06516 USA
Made in Germany

℞ Only

PZ500148 7/00 © 2000 Bayer Corporation 9787 Printed in USA